# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

HMV PROPERTIES, LLC, et al.,

        Plaintiffs,

    v.

IDC OHIO MANAGEMENT, LLC, et al.,

        Defendants.

Case No. 2:08-cv-895

Judge James L. Graham

Magistrate Judge Preston Deavers

## OPINION AND ORDER

Plaintiffs HMV Properties, LLC, The Perinpanathan Trust, and The Oswood Family Trust bring this action against Defendants IDC Ohio Management, LLC, IDC Ohio Holdings, LLC (together, "the IDC Entities"), Tom Slack, John Slack, Susan Machuga,[1] (together, "the Slack Defendants"), Benjamin Flinders, Krikorian Investment Services, Inc. ("IREA"[2]), PGP Valuation, Inc. ("PGP"), Chicago Title Insurance Company, Barry S. Slatt Mortgage Company ("Slatt Mortgage"), and John Does I – III, alleging that the collective Defendants participated in a conspiracy and perpetrated a scheme to dupe Plaintiffs into purchasing over-valued real estate in Ohio, violating the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. §§ 1961 – 1968 (2006).  (Am. Compl., Counts I and III, R. 85.)  Plaintiffs also allege several Ohio state claims.  This matter is before the Court on the Motions to Dismiss filed by Defendants Tom Slack and Susan Machuga (R. at 93), IREA and Benjamin Flinders (R. at 95), John Slack (R. at 99), and Chicago Title Insurance Company (R. at 117).

---

[1]  Susan Machuga is not named as a defendant in the caption of the Amended Complaint, but she is identified as a defendant in ¶ 26, and she has filed a Motion to Dismiss.

[2]  Krikorian Investment Services, Inc., d/b/a Investment Real Estate Associates, Inc. is referred to in the Amended Complaint as "IREA."  (See ¶ 31).

## I.    FACTS[3]

Plaintiffs HMV Properties, LLC, The Perinpanathan Trust, and The Oswood Family

Trust (referred to herein as "Vora[4], Perin[5], and the Oswood Trust, respectively) are all residents

of California who were duped into entering into sales agreements for Ohio Dairy Queen

properties based on over-inflated property appraisals, over-hyped "triple-net" leases, and the

over-stated expertise of several of the Defendants.  Acting in concert, the Defendants approached

each Plaintiff, misrepresented the value of Dairy Queen properties in Ohio, misrepresented their

own ownership interest in the properties they offered for sale, misrepresented the taxes owed on

some of the properties, and misrepresented their ability to run each Dairy Queen.  Each Plaintiff

purchased at least one Dairy Queen property (the Oswood Trust purchased two).  Once the deals

closed, Defendants failed to operate any of the Dairy Queens, failed to fulfill lease obligations,

and failed to perform promised renovations.  Each plaintiff is now left with a Dairy Queen

property valued at far less than the purchase price, each with either no tenant at all or with a new

tenant paying below the original triple-net-lease rate.

While Plaintiffs frequently refer to "Defendants" in the aggregate in the Amended

Complaint, the facts and circumstances specific to each Defendant are set forth as follows:

- Each Plaintiff worked with Defendant Flinders, as agent of Defendant IREA
  ("Flinders/IREA"), to identify and purchase investment property; Flinders/IREA
  represented themselves as experts in triple-net leases.  (Am. Compl., ¶¶ 60, 63,
  101, 144, 145.)  The timeframe provided is not clear, but Perin learned about
  "triple-net lease" properties from Flinders/IREA in "early 2007" (id., ¶60), and

---

[3] The following factual information is taken from Plaintiffs' Amended Complaint (R. at 85) and is
assumed to be true for the purposes of the motions before the Court.  See Scheuer v. Rhodes, 416 U.S.
232, 236 (1974).

[4] Plaintiff HMV Properties, LLC is referred to throughout the Amended Complaint as Mr. Jitendra Vora
("Vora"), its managing member.

[5] Plaintiff The Perinpanathan Trust is referred to throughout the Amended Complaint as "Perin Trust" or
"Perin."

Vora sometime in "approximately 2006"; no date was provided for the Oswood Trust's first encounter with Flinders/IREA.

- Flinders/IREA marketed the Dairy Queen investment opportunities as a triple-net property investment, in which the purchaser buys an Ohio Dairy Queen and then leases it—via a "triple-net lease"—to a tenant who would pay rent and expenses. (Id., ¶¶ 60, 64, 103, 145.)

- In the "spring of 2007," via email, Flinders/IREA provided each Plaintiff with a marketing brochure and "other marketing materials" for each Dairy Queen property.  (Id., ¶¶ 67, 104, 146.)  According to the Amended Complaint, the marketing materials misrepresented the IDC Entities as owner/operators of Dairy Queen properties and as the "largest operator of Dairy Queens in Ohio" and as being well-suited to run Dairy Queen properties.  (Id., ¶¶ 66, 68, 104, 113, 146, 148.)  A portion of the "marketing materials" is attached to the Amended Complaint as Exhibit A.

- Flinders/IREA sent the Oswood Trust a "Statement of Assets, Liabilities and Equity" for IDC Ohio Holdings, dated March 31, 2007.  The date and manner of communication was not specified.  At another unspecified time Flinders/IREA sent to the Oswood Trust "other financial statements for the IDC Entities."  (Id., ¶ 148.)

- Each Plaintiff entered into a sales agreement for at least one Dairy Queen property.  On April 23, 2007, Perin entered into a sales agreement for the Dayton, Ohio Dairy Queen property ("Dayton DQ"); on May 24, 2007, Vora entered into a sales agreement for the Reynoldsburg, Ohio Dairy Queen property ("Reynoldsburg DQ"); and on May 18, 2007 and May 24, 2007, the Oswood Trust entered into a sales agreement for the Brookville, Ohio Dairy Queen property ("Brookville DQ") and for the Fairborn, Ohio Dairy Queen property ("Fairborn DQ").  (Id., ¶¶ 72, 115, 156.)  The sales agreements are not attached to the Amended Complaint.

- After entering into the sales agreement, each Plaintiff was encouraged by Flinders/IREA to use Defendant Slatt Mortgage as its mortgage broker.  (Id., ¶¶ 73, 116, 160.)  No date or manner of referral was specified in the Amended Complaint.

- Defendant Slatt Mortgage required an appraisal of each property and Defendant PGP Valuation, Inc. performed each appraisal.  (Id., ¶¶ 74, 75, 117, 162.)  Plaintiffs allege that each appraisal was fraudulent because "it was based on the sham triple-net lease" and used only "comparables" of other of the IDC Entities' properties that were part of the "scam" or averred that the property was "reflective of market value." (Id., ¶¶ 75, 117, 162, 163.)  No appraisal is attached to the Amended Complaint.

- "[O]n or about June 1, 2007," Perin entered into a commitment letter with Defendant Slatt Mortgage, which Defendant Slatt Mortgage prepared and Defendant Flinders emailed to Perin.  (Id., ¶ 74.)  Neither the email nor the commitment letter is attached to the Amended Complaint.

- After entering into the sales agreement, each Plaintiff entered into a "triple net lease" agreement with Defendant IDC Holdings, LLC: Perin on June 17, 2007 (Id., ¶ 72, attached as Exh. B); Vora on June 15, 2007 (Id., ¶ 115, attached as Exh. D); and the Oswood Trust on June 15, 2007 (Id., ¶¶ 157 – 158, attached as Exhs. E and F).  The Amended Complaint does not specify where each lease was executed nor how each Plaintiff was provided with the lease.

- Defendant IDC Holdings, LLC was the lessee of each property, and it paid the rent pursuant to the lease for a few months. (Id., ¶¶ 92, 121, 187.)

- On July 12, 2007, Defendant Slatt Mortgage obtained a mortgage for Perin through non-party Standford Federal Credit Union.  Defendant Slatt Mortgage required Perin to sign a personal guarantee for the promissory note and mortgage. (Id., ¶ 78.)  None of these documents is attached to the Amended Complaint.

- On July 12, 2007, Defendant Slatt Mortgage obtained a mortgage for Plaintiff Vora through non-party California Credit Union.  Defendant Slatt Mortgage allegedly required Vora to sign a personal guarantee for the promissory note and mortgage.  (Id., ¶ 121.) None of these documents is attached to the Amended Complaint.

- On July 13, 2007, the Oswood Trust entered into a mortgage for the Fairborn Dairy Queen and on September 5, 2007, it entered into a mortgage for the Brookville Dairy Queen, signing personal guarantees for the mortgage and the promissory note for each property.  (Id., ¶¶ 174, 181.)  None of these documents is attached to the Amended Complaint.

- A Limited Warranty Deed ("LWD") was executed on July 18, 2007 conveying the Dayton Dairy Queen to Perin (id., ¶ 80); a LWD was executed on July 3, 2007, conveying the Reynoldsburg Dairy Queen to Vora (id., ¶ 123); and LWDs were executed on July 18, 2007 and on September 7, 2007, conveying the Fairborn and Brookville Dairy Queens, respectively, to the Oswood Trust (id., ¶¶ 176, 183).  None of these documents is attached to the Amended Complaint.

- From "January 2008" (id., ¶85) through September 15, 2008 (id., ¶ 136), Plaintiffs received various communications from some of the Defendants, regarding (1) late rent payments from Defendant IDC Holdings (id., ¶¶ 92, 127, 130 – 133, 187); (2) tax liens on some of the properties (id., ¶¶ 85, 86, 189); (3) renovations to the Dairy Queen properties (id., ¶¶ 86, 87, 89, 134, 188, 192); and (4) an "opportunity" from Defendant Tom Slack to convert the existing Dairy Queen properties into "Great American BBQ & Rib Company franchises" (id., ¶¶

90, 91, 129, 135, 191).  Only a few of those communications reference specific dates and form of communication.  Only one communication is attached: the March 1, 2008 letter from Defendant Tom Slack about renovations. (Id., Exh. C.)

Many of Plaintiffs' allegations of the Defendants' misrepresentations are not specific as to time, place, or form of communication.  Frequently throughout the Amended Complaint, Plaintiffs provide vague timeframes such as "early 2007" or "spring of 2007" or "approximately July 2007" (id., ¶¶ 60, 67, 68, 88, 101, 104, 111, 146) or, vaguer still, "[d]uring the sales process" or "[d]uring the due diligence phase" (id., ¶¶75, 117, 161, 162).

## II.    LAW AND DISCUSSION

### A.    Standard for Granting Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a complaint may be dismissed if it fails to state a claim upon which relief can be granted.  Because a motion under Rule 12(b)(6) is directed solely to the complaint itself, Roth Steel Prods. v. Sharon Steel Corp., 705 F.2d 134, 155 (6th Cir. 1983), the focus is on whether the plaintiff is entitled to offer evidence to support the claims, rather than on whether the plaintiff will ultimately prevail. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 184 (2005) (citing Scheuer v. Rhodes, 4l6 U.S. 232, 236 (1974)).  The purpose of a motion to dismiss under Rule 12(b)(6) "is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true."  Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993). If there is an absence of law to support the type of claim made, or if the facts alleged are insufficient to state a valid claim, or if on the face of the complaint there is an insurmountable bar to relief, dismissal of the action is proper.  Little v. UNUMProvident Corp., 196 F. Supp.2d 659, 662 (S.D. Ohio 2002) (citing Rauch v. Day & Night Mfg. Corp., 576 F.2d 697 (6th Cir. 1978)).

5

The function of the complaint is to afford the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.  See Conley v. Gibson, 355 U.S. 41, 47 (1957); Lewis v. ACB Business Serv., Inc., 135 F.3d 389, 405 (6th Cir. 1998).  A complaint need not set down in detail all the particularities of a plaintiff's claim.  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."  However, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 1949.  See also Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("A formulaic recitation of the elements of a cause of action" is not enough).  The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory."  Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988) (emphasis in original).

Legal conclusions "must be supported by factual allegations" that give rise to an inference that the defendant is, in fact, liable for the misconduct alleged.  Iqbal, 129 S.Ct. at 1949-50.  The factual allegations must show more than a possibility that the defendant acted unlawfully.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. at 1949 (quoting Twombly, 550 U.S. at 557).

In addition, Federal Rule of Civil Procedure 9(b) requires that fraud be plead with particularity.  "To satisfy FRCP 9(b), a plaintiff must at a minimum allege the time, place and contents of the misrepresentation(s) upon which he relied."  Bender v. Southland Corp., 749 F.2d

1205, 1216 (6th Cir. 1984) (upholding the district court's dismissal of RICO claims where the complaint failed to allege adequate particularity) (citations omitted).

When considering a motion to dismiss pursuant to Rule 12(b)(6), the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true.  See Scheuer, 4l6 U.S. at 236; Arrow v. Federal Reserve Bank of St. Louis, 358 F.3d 392, 393 (6th Cir. 2004); Mayer, 988 F.2d at 638.  The court will indulge all reasonable inferences that might be drawn from the pleading.  See Saglioccolo v. Eagle Ins. Co., 112 F.3d 226, 228 (6th Cir. 1997).  However, it will not accept conclusions of law or unwarranted inferences cast in the form of factual allegations.  See Gregory v. Shelby County, 220 F.3d 433, 446 (6th Cir. 2000); Lewis, 135 F.3d at 405.

**B.     The Racketeering Influenced and Corrupt Organizations Act**

Although the Racketeer Influenced and Corrupt Organizations Act ("RICO") was passed as part of a larger initiative, the Organized Crime Control Act of 1970, that specifically targeted organized crime and mob activity, see United States v. Turkette, 452 U.S. 576, 589 n.11 (1981), the Supreme Court has recognized that RICO reaches racketeering activity committed by legitimate businesses and organizations as well.  Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 498-99 (1985) ("RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime. . . . [RICO can be] used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct.").  18 U.S.C. § 1964(c) creates a civil cause of action and treble damages for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter."  Section § 1962(c), which forms the basis for Plaintiffs' claim, provides that: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  To state a § 1962(c) RICO claim, then, a plaintiff must plead a person's "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Sedima, 473 U.S. at 496; Moon v. Harrison Piping Supply, 465 F.3d 719, 723 (6th Cir. 2006); see also Salinas v. U.S., 522 U.S. 52, 62 (1997).

"Conduct" refers to a defendant's conduct or participation in the alleged enterprise's affairs.  The words "conduct or participate" imply a degree of direction, and mean that the defendant must have "*some* part in directing the enterprise's affairs[.]"  Reves v. Ernst & Young, 507 U.S. 170, 179 (1993).  This is commonly referred to as the "operation or management" test.  Id.; Stone v. Kirk, 8 F.3d 1079, 1092 (6th Cir. 1993) ("[A]lthough 'RICO liability is not limited to those with primary responsibility for the enterprise's affairs' . . . one cannot be liable under § 1962(c) unless one has participated, in some degree, 'in the operation or management of the enterprise itself.'" (quoting Reves, 507 U.S. at 179)).

Section 1961(4) defines "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The Supreme Court defines an enterprise as a "group of persons associated together for a common purpose of engaging in a course of conduct."  Turkette, 452 U.S. at 583.  Proving the existence of a "legal entity" enterprise, such as a partnership or corporation, is relatively straightforward.  Proving the existence of a "non-legal entity", "association in fact" enterprise, however, is more difficult.  "An association in fact enterprise can be proven by showing 1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged."

VanDenBroeck v. CommonPoint Mortg. Co., 210 F.3d 696, 699 (6th Cir. 2000).  These elements "require a certain amount of organizational structure which eliminates simple conspiracy from [RICO's] reach. . . . [T]he parties [must be] organized in a fashion that would enable them to function as a racketeering organization for other purposes. . . .  All that is required is some minimal level of organizational structure between the entities involved."  Id.

 "Racketeering activity" is further defined in 18 U.S.C. § 1961(1) as any one of a numerous list of state and federal offenses that qualify as racketeering activity.  A pattern of racketeering activity "is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise."  Turkette, 452 U.S. at 583.  18 U.S.C. § 1961(5) requires at least two racketeering acts.  While proof of the enterprise and pattern of racketeering activity elements may at times overlap, the Supreme Court has made it clear that these are separate elements.  "[P]roof of these separate elements [need not always] be distinct and independent, [but] the proof offered [must be] sufficient to satisfy both elements."  United States v. Johnson, 440 F.3d 832, 840 (6th Cir. 2006) (quoting United States v. Quaod, 777 F.2d 1105, 1115 (6th Cir. 1985)).

The requisite "pattern" element requires at least two predicate acts of racketeering activity within 10 years of each other.  Vemco, Inc. v. Camardella, 23 F.3d 129, 133 (6th Cir. 1994) (citing H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 237-38 (1989).  "A pattern is not automatically established, however, by a large number of unrelated acts; the acts must be ordered and arranged so as to exhibit 'relatedness' and 'continuity.'"  Id. at 133 (citing H.J., Inc., 492 U.S. at 238).

"Continuity" refers to a "closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  H.J., Inc., 492 U.S. at 241.  "Whether

a pattern of racketeering activity satisfies the continuity requirement depends on the particular

facts of each case."  Moon v. Harrison Piping Supply, 465 F.3d 719, 724 (6th Cir. 2006) (citing

H.J., Inc., 492 U.S. at 241).  "[P]laintiffs can prevail if they demonstrate either a closed-ended

conspiracy of sufficient duration or an open-ended conspiracy that could have continued into the

future."  Thompson v. Paasche, 950 F.2d 306, 311 (6th cir. 1991).

Closed-ended continuity requires a showing of predicate acts extending over a

"substantial" period of time.  "Although there are no rigid rules regarding what amounts to a

substantial period of time, racketeering activity lasting only a few weeks or months and

threatening no future criminal conduct is insufficient." Moon, 465 F.3d at 725 (citing H.J., Inc.,

492 U.S. at 242) (internal quotation marks omitted)).  See also Vemco, Inc. v. Camardella, 23

F.3d 129, 134 (6th Cir. 1994), cert. denied, 513 U.S. 1017 (1994) (predicate acts over 17 months

did not satisfy the closed period analysis); Vild v. Visconsi, 956 F.2d 560, 569 (6th Cir. 1992),

cert. denied, 506 U.S. 832 (1992) (predicate acts over six or seven months not sufficient under

closed-period analysis).

     **C.**     **Analysis of Plaintiffs' RICO claims**

       *1. RICO claims under 18 U.S.C. § 1962(c): "Pattern" and "enterprise"*

Plaintiffs allege that the Defendants in this case were part of a RICO enterprise whose

function was to dupe Plaintiffs into purchasing Ohio Dairy Queen properties at inflated sales

prices, while enabling Defendants to realize hefty profits on each sale and to walk away from

their obligations under the lease.  (Am. Compl. ¶¶ 10 – 12.)  The Moving Defendants argue that

Plaintiffs' RICO claims should be dismissed because Plaintiffs have failed to sufficiently allege

the "predicate acts" necessary to sustain a RICO claim, have failed to adequately allege a RICO

"enterprise" or "pattern of racketeering," and failed to plead their RICO claims with requisite

specificity. (Slack/Machuga Mot. Dismiss, pp. 4 – 11; Flinders/IREA Mot. Dismiss, pp. 4 – 9;

John Slack Mot. Dismiss, pp. 4 – 7; Chicago Title Mot. Dismiss, pp. 6 – 11.) While the Moving

Defendants argue that Plaintiffs' Amended Complaint is deficient in multiple respects, this Court

focuses on the inadequacies of Plaintiffs' allegation of a "pattern of racketeering" and

"enterprise."

a.    <u>Plaintiffs fail to establish closed-ended continuity<br>for the purpose of establishing a pattern of racketeering activity.</u>

Plaintiffs allege sufficient "relatedness" regarding the acts that constituted Defendants'

scheme to induce them to purchase the Dairy Queen properties. <u>See H.J., Inc.</u>, 492 U.S. at 240

(finding that predicate acts with "the same or similar purposes, results, participants, victims, or

methods of commission" fulfill the relatedness requirement). However, the Amended Complaint

fails to set forth sufficient facts and circumstances to allege the requisite "continuity." <u>See</u>

<u>Sedima</u>, 473 U.S. at 496, n. 14 (noting that it is the "factor of continuity plus relationship which

combines to produce a pattern.").

Plaintiffs assert that closed-ended continuity is sufficiently alleged, as "[D]efendants

perpetrated the same property-flipping scheme on each of the plaintiffs, which involved four

different Dairy Queen Properties and <u>which took place over a period of eighteen months</u>." (Pls.'

Resp. to Slack/Machuga Mot., p. 11; <u>see also</u> Pls.' Resp. to Flinders/IREA Mot., pp. 8 and Pls.'

Resp. to Chicago Title's Mot., pp. 8 – 9; emphasis added.) A review of the Amended Complaint,

though, reveals allegations describing activity only for approximately nine months.

Defendants' scheme, as described by Plaintiffs, was "to artificially inflate the value of the

Dairy Queen Properties purchased by Plaintiffs[.]" (Am. Compl., ¶ 246.) To advance that

scheme, Plaintiffs assert, Defendants misrepresented themselves as "triple-net lease" experts,

(<u>id.</u>, ¶¶ 60, 145), misrepresented their expertise in running Dairy Queens (<u>id.</u>, ¶¶ 66, 68, 104,

11

113, 146, 148), misrepresented the value of the properties by way of bogus appraisals (id., ¶¶ 75, 117, 162, 163), and misrepresented their intentions to run the Dairy Queen enterprises by entering into leases they never intended to honor (id., ¶¶ 99, 141, 198).

> . . . Defendants' conspiracy to scam [Plaintiffs] was a complete success.  With mathematical precision, Defendants artificially inflated the value of the property, which plummeted when Defendants walked away [from the lease obligations].  As a result, [Plaintiffs] suffered severe financial damages, including the loss of the fair market value of [their] investment[s], future rents and out-of-pocket damage, all of which [they] are entitled to recover.

(Id., ¶¶ 100, 142, 199.)  In other words, once Plaintiffs closed on the real estate deals, purchasing property at an inflated price, the scheme was complete.  At best, the facts allege that this activity began "sometime in early 2007" (id., ¶ 60) and ended with the closings of the sales of the four Dairy Queen properties, sometime in June or July 2007.[6]  Even interpreting ambiguities in Plaintiffs' favor—that the activity began January 1, 2007 and ended September 7, 2007 when the last closing appeared to have taken place—Plaintiffs' best argument for a "substantial" period of racketeering activity falls well short of what is required.  Moon, 465 F.3d at 725 ("racketeering activity lasting only a few weeks or months and threatening no future criminal conduct is insufficient" to allege a substantial period of time); Vemco, Inc. v. Camardella, 23 F.3d 129, 134 (6th Cir. 1994), cert. denied, 513 U.S. 1017 (1994) (predicate acts over 17 months did not satisfy the closed period analysis); Vild v. Visconsi, 956 F.2d 560, 569 (6th Cir. 1992), cert. denied, 506 U.S. 832 (1992) (predicate acts over six or seven months not sufficient under closed-period analysis).

---

[6] A Limited Warranty Deed was executed on July 18, 2007 conveying the Dayton Dairy Queen to Perin (id., ¶ 80); a LWD was executed on July 3, 2007, conveying the Reynoldsburg Dairy Queen to Vora (id., ¶ 123); and LWDs were executed on July 18, 2007 and on September 7, 2007, conveying the Fairborn and Brookville Dairy Queens, respectively, to the Oswood Trust (id., ¶¶ 176, 183).

Plaintiffs attempt to extend the period of activity to include schemes that Defendants allegedly perpetrated against <u>other</u> investors, investors who are not parties to this action.  "The Defendants carried out the same property-flipping scheme on fourteen other individuals, which involved fifteen Dairy Queen Properties, over a period of three years."  (Pls.' Resp. to Chicago Title's Mot. Dismiss, p. 9, citing ¶¶ 54-56 of the Amended Complaint; <u>see also</u> Pls. Resp. to Slack/Machuga's Mot. Dismiss, p. 11; Pls.' Resp. to Flinders/IREA Mot. Dismiss, p. 8.) Plaintiffs point to <u>Arnold v. Petland, Inc.</u>, Case No. 2:07-cv-01307, 2009 WL 816327 (S.D. Ohio, March 26, 2009) for the proposition that the existence of related legal actions involving the same scheme can be used to determine the requisite "substantial period of time" to establish closed-ended continuity.  (Pls.' Resp. to Chicago Title's Mot., p. 8; Pls.' Resp. to Slack/Machuga Mot., p. 11; Pls.' Resp. to Flinders/IREA Mot., p. 8.)

In <u>Arnold</u>, partners in a pet store franchise brought a RICO claim against the franchisor and supplier, alleging a scheme that lasted eleven months.  The court denied defendants' motion to dismiss, finding that plaintiffs had adequately alleged a pattern of racketeering activity because the pleading was not limited to a single scheme.  2009 WL 816327, at *11.

> Rather, plaintiffs also allege that Petland had used the same scheme to victimize other past and present Petland franchisees . . . . At this point, the Court may take judicial notice that the other franchisees have brought actions <u>in this Court against the same defendants, asserting similar factual allegations and claims</u>.  The Court finds that these related cases support plaintiffs' assertion that Petland has employed the same scheme against multiple franchisees over a substantial period of time.

<u>Id.</u> (emphasis added).  Here, Plaintiffs point to actions filed in several Ohio county courts, but they offer this Court no further information beyond case name and number.  (Am. Compl., ¶ 56, n. 2.)  The nature of those cases is not clear, nor is the identity of all of the defendants.  This Court declines to take judicial notice of these other actions.  Consequently, the facts as alleged in

the Amended Complaint fall short of establishing closed-ended continuity, as a nine-month period is decidedly insufficient.

b.     <u>Plaintiffs fail to show open-ended continuity.</u>

In similar fashion, Plaintiffs' attempt to establish an open-ended period of activity also falls short. While closed-ended continuity looks at a substantial but finite period of time over which the alleged predicate acts took place, open-ended continuity contemplates short-term racketeering activity that could continue into the future. <u>Thompson v. Paasche</u>, 950 F.2d 306, 311 (6th Cir. 1991). This kind of "future threat" can arise in two general situations: one, "where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes" or "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business . . . or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" <u>H.J., Inc.</u>, 492 U.S. at 242-43.

In <u>Paasche</u>, the Sixth Circuit reversed the trial jury's finding in favor of plaintiffs' RICO claims against several defendants, in a matter involving several real estate deals. 950 F.2d at 311. There, the court found that a scheme involving the sale of nineteen lots to several different purchasers did not have the requisite continuity to state a claim under RICO. The plaintiffs alleged, <u>inter alia</u>, that Paasche and others defrauded them in land sales in which Paasche had retained mineral rights ostensibly to "preserve the natural beauty of the land, when, in fact, he was selling the oil and gas rights at the very same time." <u>Id.</u> at 310. The court overturned the jury verdict in favor of plaintiffs, finding that the RICO claim did not survive a continuity analysis.

> Paasche's fraudulent scheme was an inherently short-term affair. He had nineteen lots to sell. Once he sold all of the lots, the scheme was over. It had to be, he had no more land to sell. Thus his scheme was, by its very nature, insufficiently protracted to

14

> qualify as a RICO violation. . . . [T]he instrumentality used to
> commit the fraud—the land—was sold during the last course of the
> fraudulent conduct, which itself lasted only a few months.  And
> there is no indication of any continuing opportunity or scheme to
> purchase or re-sell potentially oil-bearing land.

Id. at 311 (internal citation and footnote omitted).  Similarly, in Vemco, Inc. v. Camardella, 23

F.3d 129, 134 (6th Cir. 1994), cert. denied, 513 U.S. 1017 (1994), the court found that once the

"goal" of the scheme was achieved, there were no facts pleaded that indicated any future threat

of continued racketeering activity.  Here, too, Plaintiffs have failed to plead facts indicating that

Defendants' scheme, although allegedly successful against them, will continue into the future.

Plaintiffs argue that the existence of a different scheme, involving a few of the

defendants, shows the risk of continued racketeering.  (Pls.' Resp. to Chicago Title's Mot.

Dismiss, pp. 9 – 10; Pls.' Resp. to Slack/Machuga Mot. Dismiss, p. 13; Pls.' Resp. to

Flinders/IREA's Mot. Dismiss, pp. 10 – 11.)  Plaintiffs allege that on April 16, 2008, Defendants

Flinders/IREA forwarded to each of them an email from Defendant Tom Slack encouraging

Plaintiffs to convert their Dairy Queen properties into a new franchise, the "Great American

BBQ & Rib Company."  (Am. Compl. ¶¶ 90, 91, 129, and 191.)  Plaintiffs contend that this BBQ

franchise opportunity is evidence of a threat of continued racketeering activity.  "Defendants'

racketeering acts include a specific threat of repetition extending into the future.  The Defendants

are advertising the sale of franchises for the Great American BBQ & Rib Company . . . . The

Defendants' conduct in advertising, marketing and selling this 'franchise' will only result in

more victims."  (Pls.' Resp. to Chicago Title's Mot., p. 9; see also Pls.' Resp. to Slack/Machuga

Mot., p. 12; Pls.' Resp. to Flinders/IREA Mot., p. 9.)

This argument fails, as the "relatedness" factor necessary to establish a pattern of

racketeering is missing.  See H.J., Inc., 492 U.S. at 240 (describing "relatedness" as showing

predicate acts with "the same or similar purposes, results, participants, victims, or methods of commission"). This "BBQ scheme" is decidedly different than the Dairy Queen scheme: there is no mention of inflated property values and triple-net leases, and there are several Dairy-Queen-scheme defendants missing from the BBQ scheme, such as Defendants PGP Valuation, Slatt Mortgage and Chicago Title which is alleged to only possibly play a role. (Pls.' Resp. to Chicago Title's Mot., p. 9, ". . . Chicago Title may act [as] the escrow agent for any sales of the alleged "franchise." (emphasis added).)

Plaintiffs also point to other legal actions purportedly involving some of the Defendants in this action, working the same scheme, as evidence of a future threat of racketeering activity. "There are at least four other lawsuits currently pending in Ohio involving other investors that were scammed by Defendants' fraudulent property flipping scheme in 2006 through 2008." (Am. Compl. ¶ 56.) They also argue that Defendant Tom Slack's criminal history is significant: "The defendants' racketeering acts include a specific threat of repetition extending into the future. In fact, [Defendant] Thomas Slack previously was indicted in Massachusetts and Indiana for a similar fraudulent scheme." (Pls.' Resp. to Slack/Machuga Mot., p. 11; Pls.' Resp. to Flinders/IREA Mot., pp. 9.) However, those matters are not in the record before this Court, and this Court declines to take judicial notice of them, as noted supra. Furthermore, those actions do not speak to any future threat; they merely underscore the possibility that a similar scheme was worked on other investors in the past.

   c. Plaintiffs cannot meet the Sixth Circuit "multi-factor" test.

In Fleischhauer v. Feltner, 879 F.2d 1290 (6th Cir. 1989), cert. denied, 493 U.S. 1074 and 494 U.S. 1027 (1990), the Sixth Circuit adopted a "multi-factor test" for determining whether a pattern exists in any given RICO case, a test that includes relevant factors such as the "number

and variety of predicate acts" and the length of time spanning the acts.  In Columbia Natural

Resources, Inc. v. Tatum, 58 F.3d 1101 (6th Cir. 1995), the court re-affirmed the Feltner holding,

noting that two Supreme Court decisions "buttressed the validity of the multi-factor approach to

the determination of whether a pattern exists."  Id. at 1110 (referencing Sedima and H.J., Inc.,

supra).  The Sixth Circuit summed up the multi-factor test as follows:

> Therefore, to state the inquiry simply, a pattern is the sum of
> various factors including: the length of time the racketeering
> activity existed; the number of different schemes (the more the
> better); the number of predicate acts within each scheme (the more
> the better); the variety of species of predicate acts (the more the
> better); the distinct types of injury (the more the better); the
> number of victims (the more the better); and the number of
> perpetrators (the less the better).

Id. at 1110.  In Tatum, the court found that where the complaint alleged a "significant period of

activity" encompassing almost nine years, listing "dozens of examples of what [plaintiff]

Columbia considers to be mail and wire fraud[,]" and alleging "various kinds of predicate acts"

which provided the "foundation for various schemes" resulting in numerous and varied injuries,

a sufficient pattern of racketeering was pled.  Id. at 1110-11. That the number of victims was

"limited" and was "more than balanced by the strength presented in other areas."  Id. at 1111.

The pattern of racketeering activity alleged by Plaintiffs is paltry in comparison, alleging

a time period of a few months to conduct one scheme, by way of only a handful of predicate acts

perpetrated by an amorphous group of defendants, resulting in one injury to only four plaintiffs.

In sum, Plaintiffs have failed to allege the "pattern of racketeering activity" element of a §

1962(c) claim.

> d.    Plaintiffs fail to sufficiently allege the "enterprise" element.

Equally unsuccessful is Plaintiffs' allegation of the "enterprise" element of their RICO

claims.  The RICO statute defines an "enterprise" to include "any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  According to the Supreme Court, an enterprise is an entity "associated together for a common purpose of engaging in a course of conduct."  U.S. v. Turkette, 452 U.S. 576, 583 (1981).  It can be proved by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  Id.  More recently, the Supreme Court has clarified that "association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  Boyle v. U.S., 129 S.Ct. 2237, 2244 (2009).

The Court noted as well that while the enterprise need not have a "hierarchical structure" or "chain of command" there must be a showing of enterprise distinct from the pattern of racketeering activity—that the existence of an enterprise "is a separate element that must be proved."  Id. at 2245.  "For example, suppose that several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates . . . . Proof of these patterns would not be enough to show that the individuals were members of an enterprise."  Id. at 2245, n.4.

Plaintiffs, here, argue that under Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 790 (3d Cir. 1984), a complaint's "bare allegation" of entities "believed to be enterprises" is enough to satisfy that RICO element at the pleading stage.  (Pls.' Resp. to Slack/Machuga Mot. Dismiss, pp. 7 – 8; Pls.' Resp. to Flinders/IREA Mot. Dismiss, p. 4; Pls.' Resp. to Chicago Title's Mot. Dismiss, pp. 10 – 11.)

This Court, however, is bound by the Sixth Circuit, which requires proper pleading of an enterprise under Turkette.  In Begala v. PNC Bank, Ohio, the Sixth Circuit affirmed the

dismissal of a RICO claim where plaintiffs "wholly failed" to plead an association-in-fact. 214 F.3d 776, 781 (6th Cir. 2000). "A properly pled RICO claim must cogently allege activity that would show on-going, coordinated behavior among the defendants that would constitute an association-in-fact." Id. at 781 (citing Frank v. D'Ambrosi, 4 F.3d 1378, 1386 (6th Cir. 1993) (internal quotation marks omitted). Instead of alleging facts in support of "coordinated behavior among the defendants," the Begala complaint "essentially list[ed] a string of entities allegedly comprising the enterprise, and then list[ed] a string of supposed racketeering activities in which the enterprise purportedly engage[d]." Id. In sum, the Begala plaintiffs' complaint failed to allege facts that suggested the listed entities' behavior was "coordinated in such a way that they function[ed] as a coordinating unit[.]" Id. at 782 (citing Frank, 4 f.3d at 1386) (internal quotation marks omitted; alterations added).

So, too, here, Plaintiffs have alleged only a string of actions taken by Defendants either severally or in small sub-groups, and they have alleged no facts that support any allegation of "coordinated behavior" among the Defendants. In their Amended Complaint, Plaintiffs assert the "enterprise" in only generic terms:

> Defendants conducted, [through] a pattern of racketeering activity, an association-in-fact enterprise (the "IDC Enterprise"), comprised of the following individuals and entities: IDC Ohio Holdings, LLC, IDC Ohio Management, LLC, John Slack, Tom Slack, Susan Machuga, IREA, Benjamin Flinders, Slatt Mortgage and Chicago Title. As set forth throughout this Complaint, each participant in the IDC Enterprise played and continues to play a designated, well-defined and ongoing role in the affairs of the enterprise.

(Am. Compl., ¶ 206.) Plaintiffs further state that the "IDC Enterprise is an ongoing and continuing organization" (id., ¶ 207) and that "Defendants conducted the IDC Enterprise and its fraudulent schemes by entering into a contractual agreement with each other" (id., ¶ 208). In addition, they state that "[t]hrough the IDC Enterprise, Defendants have engaged, and continue

to engage in consensual decision-making to implement their fraudulent scheme[.]" (Id., ¶213.) Plaintiffs offer only conclusory allegations, no facts in support of the existence of an enterprise "by evidence of ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." Turkette, 452 U.S. at 583. A review of the entire Amended Complaint offers little else. Defendants IREA/Flinders forwarded to Plaintiffs an email from Tom Slack (Am. Compl., ¶¶ 90, 91, 129, 135, 191), but that action does not provide evidence of "on-going, coordinated behavior among the defendants." Begala, 214 F.3d at 781. The "Slack Defendants" are often referred to collectively, but the allegations of organization are related more to the individuals' membership in the defendant LLCs. (Am. Compl., ¶¶ 24 – 28.) Similarly, Defendant PGP Valuation, Inc. is alleged to have prepared fraudulent appraisals for each of the four Dairy Queen properties (Am. Compl., ¶¶ 74, 75, 117, 162), but there are no allegations of any interpersonal relationship between PGP and any of the other defendants.

Basically, Plaintiffs do little more than offer conclusory statements as to the existence of an association-in-fact enterprise without offering any facts in support of the Boyle factors: purpose, relationship, or longevity. In other words, Plaintiffs' assertion that a RICO association-in-fact exists is little more than a conclusion and a "formulaic recitation of the elements" for a RICO cause of action. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citing Papason v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")). As a result, Plaintiffs fail to sufficiently allege an enterprise for the purpose of stating a RICO claim.

Because this Court concludes that Plaintiffs have failed to sufficiently allege the "pattern of racketeering activity" and "enterprise" elements of their § 1962(c) claims, the Court need not consider the additional arguments presented by the Moving Defendants. This Court finds that

20

Plaintiffs fail to state a claim under RICO, and, as a result, Count I is dismissed with prejudice. Because Count I fails to state a RICO claim, this dismissal is in regard to <u>all</u> Defendants, including all non-moving Defendants.

2. *Plaintiffs' Claim of Aiding and Abetting under RICO*

To the extent Count II of the Amended Complaint, "Aiding and Abetting," is brought in connection with their RICO claim, Plaintiffs fail to state a claim. First, there is no provision within RICO that permits a private right of action for "aiding and abetting." Although the Sixth Circuit has not expressly ruled that RICO prohibits such an action, other courts have extended the Supreme Court's ruling in a securities case to apply to RICO claims. In <u>Central Bank of Denver v. First Interstate Bank</u>, 511 U.S. 164 (1994), the Supreme Court ruled that private aiding and abetting suits were not authorized under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j). "Congress knew how to impose aiding and abetting liability when it chose to do so. If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not." <u>Id.</u> at 192.

Further, the Court specifically rejected the argument that the phrase "directly or indirectly" (as contained in both § 10(b) and § 1962(c)) can be interpreted to create a civil aiding and abetting claim. <u>Id.</u> at 176-77. <u>See also</u> <u>Rolo v. City Investing Co. Liquidating Trust</u>, 155 F.3d 644, 657 (3d Cir. 1998) (concluding "that a private cause of action for aiding and abetting a RICO violation cannot survive the Supreme Court's decision" in <u>Central Bank</u>). Therefore, under a statutory analysis, there appears to be no private cause of action for aiding and abetting under RICO.

Even if such a right existed, Plaintiffs still fail to state a claim because they failed to successfully allege all elements of the underlying, substantive RICO claim. <u>See</u> <u>United States v.</u>

Horton, 847 F.2d 313, 322 (6th Cir. 1988) ("Before a conviction for aiding and abetting can be

upheld, it is essential that the jury find that all essential elements of the underlying crime were

committed by someone."). Therefore, to the extent that Plaintiffs allege Count II under RICO,

that claim is dismissed with prejudice as to all Defendants.

### 3. RICO claims under 18 U.S.C. § 1962(d)

Plaintiffs' claim of a RICO conspiracy also fails to state a claim. To establish a violation

of 18 U.S.C. § 1962(d), Plaintiffs must successfully allege all elements of a RICO violation, in

addition to alleging "the existence of an illicit agreement to violate the substantive RICO

provision." United States v. Sinito, 723 F.2d 1250, 1260 (6th Cir. 1983). Where, as here, the

substantive RICO count fails to state a claim, the conspiracy claim fails, too. Craighead v. E.F.

Hutton & Co., Inc., 899 F.2d 485, 495 (6th Cir. 1990). Therefore, Count III of the Amended

Complaint is dismissed with prejudice. As noted supra, since Plaintiffs fail to state a claim of

conspiracy under RICO, that claim fails as to all Defendants.

### 4. Plaintiffs' claims against John Does I – III

According to the Amended Complaint, John Does were "employees, agents, partners,

associations and/or independent contractors of Defendants or were entities that were joined with

Defendants or engaged in prohibited conduct[.]" (Am. Compl., ¶ 36.) Plaintiffs' claims against

these John Doe defendants must be dismissed without prejudice because, over the course of the

past two years, Plaintiffs have failed to identify these individuals or to serve them within the time

allotted by the federal rules.[7] See Fed. R. Civ. P. 4(m) (requiring service of summons and

complaint upon a defendant within 120 days after the filing of the complaint).

---

[7] On September 22, 2008, Plaintiffs filed their original Complaint, naming John Does I – V. (R. at 1.)
Plaintiffs filed for Leave to Amend on May 22, 2009 (R. at 75), and leave was granted on July 31, 2009
(R. at 85). Plaintiffs Amended Complaint named three John Doe defendants.

### D. Plaintiffs' State Claims

Plaintiffs have also alleged state law claims, including fraud, negligent misrepresentation, and conversion.   However, since the Court will dismiss Plaintiffs' federal claims, it declines to exercise jurisdiction over Plaintiffs' supplemental state law claims.  See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (holding that if the federal claims supporting supplemental jurisdiction are dismissed prior to trial, the state claims should be dismissed as well); 28 U.S.C. § 1367(c); Musson Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1254-55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims . . .").

## III.    CONCLUSION

As a result of the foregoing, the following motions are **GRANTED in part**: Defendants Tom Slack and Susan Machuga's Motion to Dismiss, R. 93; Defendants Krikorian Investment Services, Inc. and Benjamin Flinders' Motion to Dismiss, R. 95; and Defendant Chicago Title Company's Motion to Dismiss, R. 117.  Defendant John Slack's Motion to Dismiss, R. 99 is rendered **MOOT.**  Plaintiffs' Counts I, II, and III are **DISMISSED with prejudice as to all Defendants.**  This Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims.  Therefore, all of Plaintiffs' remaining state-law claims are **DISMISSED without prejudice.**

**IT IS SO ORDERED.**

January 4, 2011                                             /s/ James L. Graham
                                                           Judge James L. Graham
                                                           United States District Court